**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-162 (BAH)** |
| **v.** | : | |
| | : | |
| **HEATHER KEPLEY** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Heather Kepley to five months' incarceration (a sentence near the top of the Guidelines Range), one year supervised release, and $500 in restitution.

**I.        Introduction**

Kepley, a 37-year-old certified clinical medical assistant, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Kepley pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1).  As explained herein, a sentence of incarceration is appropriate in this case because Kepley: (1) moved barricades at the entrance to the West Plaza; (2) observed and experienced chemical irritants deployed against the mob by police; (3) filmed violence by other rioters against the police officers defending the Lower West Terrace (LWT); and (4) even after seeing and filming the violence, entered the LWT Tunnel during a violent clash as part of a "heave-ho" push against police.  Moreover, Kepley multiplied the seriousness of her terrible choices by bringing her minor son to the Capitol and leading him into the violence and danger in the Tunnel.

Kepley knew how serious the violence was on that day, because by her own description, she thought she was going to die when she was pinned under the mob.  Nevertheless, in the days following the riot, Kepley showed no remorse and instead spread disinformation on social media that the election was rigged.  She made her reason for going to the Capitol clear by stating that she went to "destroy the corrupt politicians," and (ominously) that she was "locked and loaded." Although she has accepted responsibility for her actions, Kepley minimized her conduct in statements to the FBI and this Court, evincing both a lack of true remorse and a continued belief in the conspiracy theories that brought her to the Capitol.

The Court must also consider that Kepley's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Kepley's crime support a sentence of five months' incarceration, one year supervised release, $500 in restitution, and a mandatory special assessment of $25 in this case.

## II.        Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 36 (Statement of Offense), at 1-6.

*Defendant Kepley's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Kepley, her co-defendant and brother Anthony Nolf, her then 15-year-old minor son, Z.K., and her then 15-year-old minor nephew, A.N., drove from Delaware to Washington, D.C. to attend former President Trump's "Stop the Steal" Rally on the Ellipse. Kepley, wearing a black North Face jacket with a pink logo, a maroon hoodie, jeans, and gloves, approached the Capitol on the west front.  Kepley was also carrying two flags, one labeled "Troops for Trump" and the other labeled "Women for Trump."



*Image 1 (Exhibit 1 at 0:28): Kepley (circled in red) approaching the west front*

After attending the Stop the Steal rally, Kepley, her brother, and the two minor children walked towards the Capitol building, approaching from the west side.  At the entrance to the West

Plaza, Kepley and her group encountered protective fencing made up of metal bike racks. Kepley assisted other rioters in removing the fencing by picking up a bike rack and passing it back to Nolf and A.N., as depicted in Exhibit 1 below.



*Image 2 (Exhibit 1 at 0:36): Kepley (circled red) passes back a bike rack in the West Plaza*

After rioters overran the West Plaza, officers retreated to the Lower West Terrace. From the West Plaza, Kepley observed that police deployed chemical irritants against the crowd. As she later admitted to law enforcement, Kepley also experienced the effects of pepper spray.

Kepley and the rest of her group proceeded up to the Lower West Terrace. From that vantage point, at 2:55 p.m., Kepley took a photo of a rioter in that area holding a U.S. Capitol Police shield.



*Image 3: Photo from Kepley's phone depicting a rioter holding a U.S. Capitol police shield*

Kepley also saw and recorded the entrance to the Tunnel using her phone.  At 3:21 p.m., Kepley saw and filmed rioters dragging a police officer out into the crowd and violently assaulting him. *See* Exhibit 2 (video taken by Kepley).  At 3:57 p.m., Kepley observed and filmed rioters using their feet and makeshift weapons as they assaulted police officers defending the entrance to the Tunnel. *See* Exhibit 3 (video taken by Kepley).



*Image 4 (Exhibit 2 at approx. 0:08): In a video obtained from her phone, Kepley, behind the camera, films as the mob violently assaulted a police officer (circled) in the Lower West Terrace*



*Image 5 (Exhibit 3 at approx. 0:15): In a video obtained from her phone, Kepley, behind the camera, films the crowd using makeshift weapons against officers in the Tunnel*

Kepley and her brother Nolf nonetheless took their minor sons and headed towards the Tunnel—into the heart of the violent battle. Kepley is depicted below in Image 6, circled in red, leading the group into the Tunnel.



*Image 6: Kepley (red) leads Z.K. (orange, redacted), Nolf (yellow) and A.N. (green) into the Tunnel*

Kepley, Nolf, Z.K., and A.N. entered the Tunnel at 4:17 p.m. Through "heave-ho" pushes, the mob pushed back the line of MPD police officers defending the Tunnel. While Kepley is not clearly visible in CCTV footage from the Tunnel, Nolf, her son, Z.K., and (at times) her nephew, A.N., are. *See* Exhibit 4 below. Around 4:21 p.m., police officers began expelling rioters from the Tunnel.



*Image 7 (Exhibit 4 at approx. 4:10): Kepley's son, Z.K. (orange, image redacted) and Nolf (yellow) inside the Tunnel*

As rioters were forced out, Kepley, Z.K., and A.N. all fell at the entrance of the Tunnel and became trapped for several minutes.  *See* Image 8 and Exhibit 5.  Later, in an interview with the FBI (described more below), Kepley recalled being trampled. She felt like she was going to die. During the ensuing chaos (as rioters continued to assault police officers at the Tunnel mouth), Kepley got out of the pile.  *See* Exhibit 5.



*Image 8: Kepley's son, Z.K. (orange), is trapped, with Nolf (yellow) nearby*



*Image 9 (Exhibit 5 at 0:03): A.N. (green) and Kepley (red) emerging from the pile*

Kepley bloodied her face, as depicted in Images 10 and 11 below.  Nonetheless, based on metadata from videos from her phone, Kepley appeared to remain in the Lower West Terrace as late at 5:04 p.m.



*Images 10 (left) and 11 (right): Kepley is bloodied after she gets out of the pile*

*Kepley's Social Media Posts*

After the attack on the Capitol, Kepley used social media to both minimize and justify her own and the mob's conduct.  Kepley also admitted that she was at the Capitol to 'destroy' corrupt politicians.  Kepley ominously posted that she was prepared for when the "democratic political[2] agenda. . .eventually end[s] and it's not going to be pretty," warning, "[l]ocked and loaded."  A selection of Kepley's statements on Facebook relating to her participation in the riot are summarized below.

On January 9, 2021, at 8:05 a.m., Kepley posted, "We went after the corrupt politicians, not the capital. I was in the capital and unless you were there, I dont give 2 shits about your opinion or the fake news."  Exhibit 6.

---

[2] In the Statement of Offense and, accordingly, the PSR, the word "political" is misquoted as "politician."  ECF No. 36 at 14; PSR ¶ 51.  The Government regrets the error.

On January 9, 2021, at 8:08 a.m., Kepley posted, "If we wanted to fick up DC, we could have flattened the city, but we didn't, we were going after the corrupt politicians, not the city." *Id*.

On January 9, 2021, at 8:20 a.m., Kepley posted, "Correct.  We all walked away.  There were hundreds of thousands of people there.  We could have flattened DC If we wanted to but we were not there to destroy it, we were there to destroy the corrupt politicians.  There is a very long tunnel underground that leads about 2 blocks behind the capital that all the politicians were taken through to evacuate. To [sic] bad they didn't want to stay and face us, the people." *Id.*

On January 9, 2021, at 8:50 a.m., Kepley posted: "i made it in the capital, and believe it or not, I didnt break anything. I didnt set anything on fire.  I was there for Pelosi, that's all."  Exhibit 7.

On February 11, 2021, at approximately 2:57 p.m., Kepley posted, "anyone with just an oz of CFS [common fucking sense] can see the entire election BS was rigged and we are all puppets in the democratic political agenda but it's how much longer are we going to take it before WE THE PEOPLE stand up for out [sic] country and what's right.  Clearly leaving the country up to the government is not a wise idea.  Politicians are corrupt and don't give a crap about anyone else. This will eventually end and it's not going to be pretty.  Locked and loaded."  Exhibit 8.

On February 12, 2021, at approximately 12:31 p.m., Kepley posted, "I was in DC also during the 'riots'.  We were not there to destroy anything.  We just want answers and the truth." Exhibit 9.

On February 12, 2021, at approximately 12:43 p.m., Kepley posted, "If DC is calling 1/6 a riot.  How about America actually show them a real riot."  *Id.*

*Kepley's Pre-Arrest Interview with the FBI*

On January 20, 2022, Kepley voluntarily spoke with FBI agents.  During the interview, Kepley explained that she, Nolf, A.N., and Z.K. traveled to Washington DC together, attended the "Stop the Steal" rally, and walked over to the Capitol after they heard calls to go protest.  Kepley admitted to the broad strokes of her criminal conduct, including seeing violence against police, going inside the Tunnel, and being trampled on her way out of the Tunnel.  Kepley told the agents she believed she was going to die.  Nonetheless, Kepley minimized at least three key facts: (1) she claimed that she did not recall moving any police barriers or bike racks, (2) she asserted, falsely, that she was pushed inside the Tunnel by others, and (3) she claimed she had no intent to go inside the Capitol building.  These claims are flatly contradicted by the evidence.

Kepley also attempted to shift blame to Antifa for the violence near the Tunnel in spite of her actions going into the Tunnel. She claimed that her Facebook posts about hunting for politicians at the Capitol were intended to convey only that she wanted answers from the politicians, not that she was there to commit violence against them.  Finally, Kepley falsely claimed that she did not have any videos from that day, and that the only still image she kept was an image at the Washington monument.[3]

*Kepley's Post-Arrest Interview with the FBI*

On April 5, 2023, following her arrest, Kepley again interviewed with FBI agents.  Kepley told them that she went to the Capitol because former President Trump said to go protest the rigged election.  Kepley admitted to being pepper sprayed and to being trapped in a pile.  But Kepley was vague on whether she made it into the Tunnel—stating that she made it to the "stairs" before the

---

[3] The Government executed a Rule 41 premises search warrant of Kepley's home and searched the device Kepley used on January 6, which contained numerous videos and pictures from January 6, and her current device, which also contained numerous photos from January 6.

"door" and "never made it in that far" before voluntarily turning around (which is again belied by the evidence). She also denied seeing barricades and again claimed that Antifa was present. Most concerningly, Kepley described her participation in the events of January 6, 2021 as a "history lesson" and the "biggest corruption in the entire government" that she wanted to see first-hand.

*The Charges and Plea Agreement*

On April 3, 2023, the United States charged Kepley by criminal complaint with violating 18 U.S.C. § 1752(a)(1) and (a)(2). On April 5, 2023, law enforcement officers arrested her at her home in Delaware. On May 10, 2023, the United States charged Kepley by Indictment with violating 18 U.S.C. § 1752(a)(1) and (a)(2). On August 11, 2023, pursuant to a plea agreement, Kepley pleaded guilty to Count Two of the Indictment, charging her with a violation of 18 U.S.C. § 1752(a)(1). By plea agreement, Kepley agreed to pay $500 in restitution to the Architect of the Capitol.[4]

### III.   Statutory Penalties

Kepley now faces a sentencing on a single count of violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment, one year supervised release, and a fine of up to $100,000. The defendant must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should

---

[4] On October 20, 2023, Nolf pled guilty to violating 18 U.S.C. § 231(a)(3), impeding officers during and in furtherance of a civil disturbance. This Court scheduled Nolf's sentencing hearing for January 19, 2024.

be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Kepley's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)(vii)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 63–72.

The U.S. Probation Office calculated Kepley's criminal history as a Category I. PSR at ¶ 76.  Accordingly, the U.S. Probation Office calculated Kepley's total adjusted offense level, after acceptance, at 4, and her corresponding Guidelines imprisonment range at 0 to 6 months. PSR at ¶¶ 72, 108. Kepley's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of five months' incarceration, one year supervised release, and $500 in restitution.

### A.   The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Kepley's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Kepley, the absence of violent or destructive acts is not a mitigating factor. Had Kepley provably engaged in such conduct, she would have faced additional criminal charges.

One of the most important factors in this case, and the lens through which Kepley's actions should be viewed, is that Kepley did what no parent should ever do—her criminal choices placed her minor son in harm's way.  Although the day began as a family trip to D.C., Kepley compounded bad decision on bad decision, ignoring clear red flags and leading her son into real danger.  Kepley moved protective barricades in the West Plaza.  Kepley (and likely her son as well) were exposed to and observed chemical sprays deployed by police.  They watched the overwhelmed officers retreat to the Lower West Terrace.  In the Lower West Terrace, Kepley filmed the mob violently drag out and assault a police officer, and then attack officers in the Tunnel with makeshift

weapons—all of which, her minor son and nephew would have seen as well.  Yet none of those warning signs deterred Kepley, for her own sake or that of the teenagers in her care.  Instead, Kepley led her family members *towards* the violence—into the Tunnel.  And when officers repelled the rioters from the Tunnel, Kepley and the two minors all became trapped in a pile of rioters at the Tunnel entrance.  It is no exaggeration to say that Kepley's choices placed her life, her son's and nephew's lives, and the lives of the officers in the Tunnel at risk—as Kepley herself explicitly acknowledged when she later said she believed that she was going to die that day.  As Judge Jackson stated in sentencing another rioter who brought his 16-year-old son to the Tunnel, this extraordinarily dangerous choice "defies understanding" and is "inexcusable."  Transcript of Sentencing Hearing at 58, *United States v. Kyle Young*, 21-CR-291-ABJ (Sept. 27, 2022).

Kepley's criminal choices were driven by her fervent (but false) stated belief that the 2020 Presidential Election was stolen and her corresponding goal to "destroy the corrupt politicians," *i.e.*, Congress.  As her remorseless and chilling social media posts in the following days following the riot made plain, Kepley directly tied her own presence at the Capitol to her wish to destroy Congresspeople, writing: "[W]e were there [in DC] to destroy the corrupt politicians.  There is a very long tunnel underground that leads about 2 blocks behind the capital that all the politicians were taken through to evacuate. To bad they didn't want to stay and face us, the people."  Kepley made clear who she blamed: "the entire election BS was rigged and we are all puppets in the democratic political agenda. . . ."  Notwithstanding the carnage in which she had participated, Kepley ominously hinted at future violence: "This will eventually end and it's not going to be pretty.  Locked and loaded."

Kepley's choices, both as a citizen of our democracy and as a parent, must have consequences. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Kepley's History and Characteristics

As set forth in the PSR, Heather Kepley has no criminal history and has stable employment as a Certified Clinical Medical Assistant. PSR ¶¶ 73–79, 99. She has been compliant with all Court-ordered conditions of release. PSR ¶ 28.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most

compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

There is a clear need to deter Kepley from ever again participating in a riot like the January 6, 2021 attack on the Capitol.  Kepley has accepted responsibility for her actions through her plea, but her statements to the FBI and to this Court during her plea colloquy demonstrate that she does not appreciate the significance of her actions and lacks genuine remorse.

When Kepley was first interviewed by the FBI, she was truthful as to the general contours of her conduct on January 6, 2021.  However, she minimized certain aspects of her conduct—that she did not recall moving any police barriers or bike racks, that she was involuntarily pushed into the Tunnel, and that she had no intent to go inside the Capitol building.  She also minimized the import of her social media posts, essentially stating that she merely wanted answers from the politicians.  Kepley also lied to the FBI about whether she still had images and pictures from the day, as the later search warrant of her devices proved.   And during her second interview, in April of this year, Kepley again gave vague admissions, minimizing what she saw.  Most concerningly, Kepley described her participation in the events of January 6, 2021 as a "history lesson" and the "biggest corruption in the entire government" that she wanted to see first-hand.

Kepley also tried to minimize her culpability during her guilty plea. Kepley initially struggled to admit that she was inside the Tunnel.  Tr. of Plea Colloquy at 14–16, 23-cr-162-BAH (Aug. 11, 2023).  And she claimed to not remember moving barricades, observing a rioter in that area holding a U.S. Capitol Police shield, or seeing the mob assaulting a police officer.  *Id.* at 17–19.  When the Court asked Kepley what she meant when she posted on social media that she was "there for Pelosi, that's all," Kepley gave the incredulous answer that "we were there to honestly get answers from actual people and not the media. . . . We just were hoping that they would step out and confront us" and that she wanted to hear directly from former Speaker Pelosi because Kepley trusted her view as the Speaker.  *Id.* at 20:16-21:4.  When this Court then inquired whether former Speaker Pelosi was one of the "corrupt politicians" Kepley referred to in another post, Kepley hedged: "No, not necessarily."  *Id.* at 21:11-14.  That answer is flatly contradicted by a February 11, 2021 social media post Kepley admitted to making, which stated: "[A]nyone with

just an oz of CFS [common fucking sense] can see the entire election BS was rigged and we are all puppets in the democratic political agenda . . . ."

What is clear is that Kepley's admissions have been halting, half-hearted, and qualified—not the stuff of genuine remorse. Her post-January 6 rhetoric, her statements to the FBI and to this Court, as well as observations by the Probation office (*see* PSR ¶¶ 97, 98) (describing her QAnon-affiliated "WWG1WGA" sticker),[5] suggest that Kepley remains susceptible to fanaticism of the kind that led her to the Capitol on January 6, 2021. Incarceration is necessary to specifically deter Kepley from future such conduct.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[6] This Court must sentence Kepley based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Kepley has pleaded guilty to Count Two of the Indictment, charging her with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C.

---

[5] According to Probation, WWG1WGA stands for "Where We Go One, We Go All," which is affiliated with the QAnon conspiracy movement. Kepley came to her Probation interview with this sticker on her car. PSR ¶¶ 97, 98.

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

§ 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. Specifically, cases where defendants were present on the Lower West Terrace, and those involving minors, serve as the most apt comparators.

In *United States v. Kyle Young*, 1:21-CR-00291-ABJ, Young joined the storming of Tunnel for fifteen minutes, harassed officers within the Tunnel with a strobe light, passed a taser to another rioter and showed him how to use it, and assaulted numerous officers both inside and outside of the Tunnel, including physically restraining Officer Fanone's wrist. Throughout, Young's 16-year-old son, who Young brought to the Capitol, closely followed on his heels. Judge Jackson sentenced Young to 86 months' incarceration on his felony 18 U.S.C. § 111(a) conviction. Young's case is clearly more serious than Kepley's—Kepley did not assault officers inside or outside the Tunnel, is convicted of only a misdemeanor, and has no criminal history. But at sentencing, Judge Jackson addressed factors that apply equally to Kepley, starting with her choice to enter the Tunnel in the first place: "[T]his defendant pushed through the crowd to enter the tunnel. This was a deliberate choice. He was not supposed to be there. His reaction to the mayhem around him was, not to back away or to depart, but to film it." Transcript of Sentencing Hearing at 48:14-18, *United States v. Kyle Young*, 21-CR-291-ABJ (Sept. 27, 2022). Judge Jackson also excoriated Young's decision to involve his 16-year-old son in the chaos in the Tunnel, by handing

him a strobe light and leading him to another assault outside: "[It] defies understanding that presence of your 16-year-old son by your side on January 6 did not inspire you to curb your behavior in the slightest. . . . [H]is son was given by you the tools to participate. This inexcusable performance of yours was not only carried out in his presence, but you permitted and encouraged him to get involved and you gave him the strobe light [inside the Tunnel] to hold himself." *Id.* at 58:4-12; *see also id.* 50:17-19, 51:16-18. Kepley's decision to bring her son into the Tunnel likewise "defies understanding," and her "inexcusable performance" justifies an incarceratory sentence.

In *United States v. Virginia Spencer*, 1:21-CR-00147-CKK, the defendant and her husband brought along their 14-year-old child to the Capitol. Spencer was involved in a verbal altercation outside, entered the Capitol near the breach of the Senate Wing Door, was present in the Crypt during the fall of the police line, in former Speaker's Pelosi's office suite, and outside the House Chamber, and minimized her conduct to the FBI. After Spencer pled guilty to 40 U.S.C. § 5104(e)(2)(G), Judge Kollar-Kotelly sentenced her to three months incarceration. While Kepley did not enter the Capitol, the Tunnel was in many ways more dangerous for her minor son, and Kepley's statements about her intent—to "destroy the corrupt politicians," and that she was "locked and loaded"—merit a sentence of similar if not greater length.

In *United States v. Annie Howell*, 21-CR-00217-TFH, the defendant similarly knew rioters had breached defensive perimeters established by police at the U.S. Capitol, witnessed and filmed violence between other rioters and law enforcement officers at the Tunnel entrance, and made statements on social media during and after the riot that displayed a lack of remorse, including falsely blaming the law enforcement officers for the violence on January 6. After Howell pled guilty to violating 18 U.S.C. § 1752(a)(1), Judge Hogan sentenced Howell to 60 days' intermittent

confinement as a condition of 36 months' probation, with 60 hours community service, and $500 restitution.  While, unlike Kepley, Howell prepared for violence prior to the attack, actually entered the Capitol, and may have destroyed evidence, she (i) did not enter the Tunnel during violence with her son, (ii) did not claim that she was there to "destroy the corrupt politicians," and (iii) did not continue to minimize her conduct and statements to the FBI and this Court, as Kepley has.  A similar sentence is thus appropriate.

Finally, in *United States v. Andrew Jackson Morgan Jr.*, 21-cr-313-TJK, the defendant went to the Tunnel, pushed against police with the mob, and posted to social media after the riot without remorse.  After Morgan pled guilty to 18 U.S.C. § 1752(a)(1), Judge Kelly sentenced him to 110 days incarceration, 1 year supervised release, and $500 restitution.  Morgan's conduct is more severe in many ways—he joined the riot early, actively berated and threatened police officers, encouraged other rioters at the Tunnel, was present on Capitol Grounds for an extended period, and had a then pending-charge of "Interfering with Public Duties."  Morgan also had an extensive criminal history.  But Kepley's shocking decision not only enter the Tunnel and participate in a "heave-ho" but to also bring her son into the conflict with police in the Tunnel indicates that a significant term of incarceration is appropriate here.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v.*

*Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.      Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Kepley must pay $500 in restitution, which reflects in part the role Kepley played in the riot on January 6.[8] Plea Agreement at ¶ 12. As the plea agreement

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can

reflects, the riot at the United States Capitol had caused "as of October 14, 2022, approximately $2,881,360.20 damage to the United States Capitol." *Id.*  (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.)  Kepley's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 129.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to five months' incarceration, 1 year supervised release, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing her acceptance of responsibility for her crime.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    s/ *Michael L. Barclay*
MICHAEL L. BARCLAY
Assistant United States Attorney
N.Y. Bar Reg. No. 5441423
U.S. Attorney's Office for the District of Columbia
601 D Street, NW
Washington, D.C. 20001
(202) 252-7669
Michael.Barclay@usdoj.gov

</div>

---

be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).