**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-162-2 (BAH)** |
| **ANTHONY NOLF** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.   For the reasons set forth herein, the government requests that the Court sentence Anthony Nolf to 11 months' incarceration (at sentence at the mid-point of the Guidelines Range), 3 years' supervised release, $2,000 restitution, and the mandatory assessment of $100.

## I.     INTRODUCTION

The defendant, Anthony Nolf, a 38-year-old owner of a landscaping business and a security guard, participated in the January 6, 2021 attack on the United States Capitol—a violent attack which interrupted the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05.   That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021,

On January 6, Nolf moved barricades at the entrance to the West Plaza, then—despite observing violence and experiencing chemical irritants deployed against rioters by police—entered the Lower West Terrace Tunnel (the "Tunnel") and added his body weight to a "heave-ho" push against police.   Nolf multiplied the seriousness of his terrible choices by bringing his minor son along with him to the Capitol, and leading him into the violence and danger in the Tunnel. Although Nolf has now pled guilty, he initially lied and minimized his conduct in subsequent statements to the FBI, evincing a lack of true remorse.

The government recommends that the Court sentence Nolf to 11 months' incarceration for his conviction of violating 18 U.S.C. § 231(a)(3).   An 11-month sentence reflects the gravity of Nolf's conduct.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 46, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      Nolf's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Anthony Nolf, his then 15-year-old minor son, A.N., his sister and co-

---

and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

defendant Heather Kepley, and his 15-year-old minor nephew, Z.K., drove from Delaware to

Washington, D.C. to attend former President Trump's "Stop the Steal" Rally on the Ellipse.   After

attending the Rally, Nolf, wearing a camouflage-colored hat with the words "Trump 2020" in red,

white, and blue typeface, a gray hoodie, blue jeans, and at times, a camouflage gator, approached

the Capitol from the west front.   *See* Image 1.



*Image 1 (minor redacted): Nolf (circled) wearing a camouflage-colored hat with the words "Trump 2020" in red, white, and blue typeface, a gray hoodie, blue jeans, and a camouflage gator*

At the entrance to the West Plaza, Nolf and his group encountered protective fencing made

up of metal bike racks.   The fencing demarcated the Restricted Area which Nolf and the other

rioters were prohibited from entering.   Despite this, Nolf assisted in removing the fencing by

passing it back as Kepley handed it to him, as depicted in Image 2 below.



*Image 2: Nolf (red) and A.N. (green, redacted) pass back a bike rack in the West Plaza as Z.K. (orange, redacted) observes*[2]

As rioters overran the West Plaza, law enforcement officers guarding the area retreated to the Lower West Terrace.   From the West Plaza, Nolf observed police deploying chemical irritants against the crowd in an attempt to stop the rioters' intrusion.

Nolf and the rest of his group proceeded up to the Lower West Terrace.   From that vantage point, Nolf could see the entrance to the Tunnel.   Nolf was standing in close proximity to Kepley and Z.K., who both recorded the riot with their phones.   At approximately 3:21 p.m., Nolf saw rioters drag an MPD officer out from the Tunnel and into the crowd, then violently assault the

---

[2] For clarity, the government incorporates by reference certain exhibits publicly disclosed in connection with co-defendant Heather Kepley's sentencing, and which are described in the Government's Report at ECF No. 52 (hereinafter "Kepley Exhibit No."). For this image, see also Kepley Exhibit No. 1 at approx. 0:37.

officer, which was captured on Kepley's phone. *See* Image 3.   At approximately 3:57 p.m., Nolf

witnessed rioters assaulting other law enforcement officers who were attempting to defend the

entrance to the Tunnel, which Kepley also captured on her phone.   *See* Image 4.



*Image 3: Nolf witnesses the mob violently assault a police officer (circled) in the Lower West Terrace, captured on Kepley's phone[3]*

---

[3] *See also* Kepley Exhibit No. 2 at approx. 0:08.



*Image 4: Nolf also sees the mob use makeshift weapons against officers in the Tunnel, captured on Kepley's phone[4]*

Nolf and Kepley nonetheless took their minor sons and headed towards the Tunnel—into the heart of the violent battle between rioters and law enforcement.   Nolf is depicted below in Image 5, circled in yellow, heading towards the Tunnel behind Kepley and Z.K.

---

[4] *See also* Kepley Exhibit No. 3 at approx. 0:15.



*Image 5: Nolf (yellow), behind Kepley (red) and Z.K. (orange, redacted), leads A.N. (green) into the Tunnel*

Nolf, Kepley, Z.K., and A.N. entered the Tunnel at 4:17 p.m.   Through "heave-ho" pushes, the mob pushed back the line of MPD police officers defending the Tunnel.   Nolf added his body weight to the "heave-ho" pushes by lowering his body and dropping his shoulder into the rioters in front of him, which added pressure against the officers defending the Tunnel.   *See* Image 6. Moments after joining that "heave-ho," when the mob's progress halted, Nolf can be seen grinning. *See* Image 7.   Around 4:21 p.m., police officers began expelling rioters from the Tunnel.



Wednesday, January 06, 2021 4:19:53 PM

*Image 6: Nolf (yellow)—standing next to Z.K. (orange, redacted)—lowers his body and drops his shoulder into the rioters in front of him, adding pressure against officers[5]*

---

[5] *See also* Kepley Exhibit No. 4 at approx. timestamp 4:05.



*Image 7: Nolf (yellow)—still next to Z.K. (orange, redacted)— smiles inside the Tunnel (image has been brightened)*[6]

As rioters were forced out of the Tunnel by law enforcement, Kepley, Z.K., and A.N. all fell at the entrance of the Tunnel and became trapped for several minutes.   *See* Images 8–9.   Nolf stood nearby and waited for his son, A.N., to extract himself.   *See* Image 10.   In the chaos, rioters continued to violently assault the police at the entrance.   Nolf, standing feet away, saw the recurring melee.

---

[6] *Id.*



*Image 8: Nolf (yellow) on the Tunnel steps as Z.K. (orange) is trapped*



*Image 9: A.N. (green) and Kepley (red) emerging from the pile[7]*

---

[7] *See also* Kepley Exhibit No. 5 at approx. 0:03.



*Image 10: Nolf (yellow) watches as A.N. (green, redacted) extracts himself from the pile*

After freeing themselves from the mob, according to metadata from Kepley's phone, Nolf and the rest of the group remained on the Lower West Terrace through at least 5:04 p.m.   At that time, as captured on Kepley's phone, police came out from the Tunnel shooting tear gas cannisters to clear rioters from the Lower West Terrace.

## C.  Nolf's Statements to the FBI

The FBI interviewed Nolf twice related to his conduct at the Capitol.   In the days following the Capitol attack, the FBI received a report from A.N.'s school that A.N. told classmates he had attended the Stop the Steal Rally and saw a woman get shot.   On January 19, 2021, the FBI interviewed Nolf and A.N. at their residence.   Nolf admitted to being at the Capitol building, but stated that neither he nor A.N. entered the Capitol building.   Nolf also lied about or minimized several aspects of his conduct, falsely stating that: (1) he and A.N. were on the steps of the U.S.

Capitol building and were well beyond a line of police pushing people back; and (2) he did not participate in or support any acts of violence or property destruction.

On November 18, 2021, the FBI again interviewed Nolf.   When confronted with evidence that he was in fact up against a police line, Nolf walked back his prior false statement, stating that he thought the line was entering the building.   Nolf again sought to minimize his conduct and paint himself in a favorable light, stating that he never entered the building or fought with police, and claimed that even though he was offered a can of raid that he did not use it.   Nolf said he and his son were there to express their frustration regarding the election.

## III.    THE CHARGES AND PLEA AGREEMENT

On May 10, 2023, a federal grand jury returned an indictment charging Nolf with three counts, including 18 U.S.C. § 231(a)(3).   On October 20, 2023, Nolf pled guilty to that offense pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Nolf now faces sentencing on one count of 18 U.S.C. § 231(a)(3). As noted by the plea agreement and the Presentence Report ("PSR") issued by the U.S. Probation Office, the defendant faces up to 5 years' of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, $2,000 in restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Nolf's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4) | 10 |
| Specific Offense Characteristic (U.S.S.G. §2B2.4(b)(1)(A)) | +3 |
| Acceptance of Responsibility (U.S.S.G. §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 11 |

*See* PSR at ¶¶ 51–59.

The U.S. Probation Office calculated Nolf's criminal history as a Category I.   PSR at ¶ 62. Accordingly, the U.S. Probation Office calculated Nolf's corresponding Guidelines imprisonment range at 8 to 14 months. PSR at ¶ 92.   Nolf's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.   Section 4C1.1 will be in effect at the time of sentencing in this matter, but was not addressed in the parties' plea agreement. Section 4C1.1 does not apply in this case, because Nolf directly "use[d] violence [and] credible threats of violence" through his participation in the mob's "heave-ho" pushes against Metropolitan Police Department officers in the Tunnel. U.S.S.G. § 4C1.1(a)(3).   At co-defendant Kepley's sentencing hearing, the Court properly held that the § 4C1.1 adjustment did not apply because Kepley's conduct in the Tunnel involved a credible threat of violence against the officers in the Tunnel.   Because Nolf's participation in the heave-ho is even clearer and more egregious than Kepley's, the Court should reach the same conclusion here.

14

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Nolf's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   Here, Nolf removed protective fencing around the Capitol grounds, proceeded to the Lower West Terrace, entered the Tunnel and engaged in the heave-ho against law enforcement officers protecting the Capitol building.

Moreover, one of the most important factors in this case (and the lens through which Nolf's actions should be viewed) is that Nolf did what no parent should ever do—he placed his minor son in harm's way through his criminal actions.   Nolf and his son were exposed to and observed chemical spray deployed by police.   Nolf, A.N., and Z.K. also watched the mob violently drag out and assault a police officer, and then attack officers in the Tunnel with makeshift weapons. Yet none of those warning signs deterred Nolf, for his own sake or that of the teenagers in his care. Instead, following in Kepley's footsteps, Nolf led his son towards the violence and into the Tunnel. Nolf gleefully joined the "heave-ho" against the officers as the mob inched forward, smiling during a pause in the scrum.   And when officers repelled the rioters from the Tunnel, his minor son and nephew became trapped in a pile of rioters at the Tunnel entrance for several minutes, though Nolf escaped unscathed.   Like those of his co-defendant Kepley, Nolf's choices placed his own life,

his son's, his nephew's, and the lives of the officers in the Tunnel at risk.   As Judge Jackson stated in sentencing another rioter who brought his 16-year-old son to the Tunnel, this extraordinarily dangerous choice "defies understanding" and is "inexcusable."   Transcript of Sentencing Hearing at 58, *United States v. Kyle Young*, 21-CR-291-ABJ (Sept. 27, 2022).   The nature and circumstances of Nolf's offense are very serious, and fully support the government's recommended sentence of 11 months of incarceration.

### B.  The History and Characteristics of the Defendant

Nolf has no criminal history and has experienced past and continuing personal and family hardships.   However, nothing in his history explains or justifies his decision to engage in (and involve his son in) his criminal conduct at the Capitol on January 6.[8]

---

[8] The government notes the PSR's reference to Nolf's current family circumstances and will closely review any related submissions by the defense. *See* PSR ¶¶ 73–75.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Nolf's criminal conduct on January 6 was the epitome of disrespect for the law. Transcript of June 9, 2023 Sentencing Hrg. At 20, ECF No. 90, *United States v. Cronin*, 22-cr-233-ABJ ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

**D.    The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[9] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of significant incarceration. In particular, there is a need to deter Nolf from ever again participating in a riot like the January 6, 2021 attack on the Capitol.   While

---

[9] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

17

Nolf accepted responsibility for his actions through his plea, his recognition of the wrongfulness of his actions was a long time coming.   On January 6, 2021, Nolf clearly did not recognize the gravity of his choice to add his body weight to the crushing pressure against the officers defending the Tunnel, or even care about the harms he caused—in the midst of the melee, he grinned.   Then in the days after the Capitol attack, Nolf lied about his actions to the FBI, claiming that he and his son were well back from the police line.   Even after the FBI subsequently confronted him with evidence to the contrary, Nolf still did not accept fault.   Rather, Nolf pointed to what he didn't do—that he never entered the building or fought with police; that he did not use a can of raid against officers.   Incredibly, and contrary to all the evidence, Nolf again claimed he was *not* trying to enter the building, and justified his presence as expressing his frustration regarding the election.

Nolf may have pled guilty, but this decision followed repeated justifications, minimization, and outright lies to the FBI.   Nolf has also yet to express true remorse for his role in his own role in the Tunnel "heave-ho," as well as his decision to bring his minor son, A.N., with him.   An incarceratory sentence is necessary to specifically deter Nolf from participating in an obviously violent riot as a means to express political frustration—or encouraging his children to do the same—ever again.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied]

and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.   *See United States v. Daniel Leyden*, 22-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, 21-cr-198 (TSC), Sent. Hrg. Tr. at 49

("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1096. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[10]

---

[10] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[11]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Roger Baugh*, 22-cr-313-JEB, Baugh passed visible signs noting the Capitol was closed and saw rioters assaulting, hitting, and throwing objects at the police officers in the Lower West Terrace.   Baugh followed his co-defendant (who Baugh knew was armed with a pistol) into the Lower West Terrace Tunnel and engaged in several heave-ho efforts designed to dislodge officers.   Baugh also knew his co-defendant had stolen a police baton and subsequently lied about it to the FBI.   Baugh had an identical 8 to 14-months Guideline range following his 18 U.S.C. § 231(a)(3) plea; then-Judge Boasberg sentenced him to 12 months and 1 day incarceration and 24 months' supervised release.   Like Baugh, Nolf was aware of (and even helped move) barricades, saw violence against the officers in the LWT, participated in a heave-ho, and lied to

---

[11] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

the FBI about significant aspects of his conduct.   While Nolf was not aware of anyone else in his group with weapons, he brought his own minor son into the melee, justifying an incarceratory sentence of similar length.

In *United States v. Luke Lints*, 22-cr-259-TNM, Lints was on the front line of a heave-ho against officers in the LWT tunnel, used a police riot shield to prevent officers from closing the door, then pushed that shield against an officer's shield.   Lints post-January 6 social media posts showed a complete lack of remorse and blamed officers.   Lints and Nolf have the same offense of conviction and Guidelines range.   Judge McFadden sentenced Lints to 4 months' incarceration followed by 4 months of home detention.   While Nolf and Lints's behaviors were not identical, Nolf's decisions to move barricades demarcating the restricted area, involve his minor son in his crime and expose A.N. to violence, and lie to the FBI, justify a more severe sentence.

This Court's recent sentence of co-defendant Heather Kepley to 28 days' intermittent incarceration followed by 60 days home detention as a condition of 36 months' probation is relevant, but Kepley is not similarly situated in a key respect:   Nolf's participation in the heave-ho efforts against officers in the Tunnel is far more clear.   As a result, Nolf stands before this Court convicted of a felony, not a misdemeanor, and faces a significantly greater guidelines range (8 to 14 months as opposed to 0 to 6 months).   Sentencing Nolf within the Guideline Range for his offense—as this Court did with Kepley—reflects the severity of Nolf's offense and will not drive sentencing disparity since it "'necessarily' complies with § 3553(a)(6)."   *See Bartlett*, 567 F.3d at 908.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[12]   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).   At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.   The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Nolf must pay $2,000 in restitution, which reflects in part the role Nolf played in the riot on January 6.[13]   Plea Agreement at ¶ 12.   As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in

---

[12]  The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[13]  Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

23

damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* (as noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.)   Nolf's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 114.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 11 months of incarceration, 3 years of supervised release, $2,000 restitution, and the mandatory assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:     */s/ Michael L. Barclay*
MICHAEL L. BARCLAY
Assistant United States Attorney
N.Y. Bar Reg. No. 5441423
U.S. Attorney's Office for the District of Columbia
601 D Street, NW
Washington, D.C. 20001
(202) 252-7669
Michael.Barclay@usdoj.gov